UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KONSTANTIN AVERKIEV,<br><br>*Plaintiff*,<br><br>v.<br><br>LAKE WASHINGTON SCHOOL DISTRICT; DR. JON HOLMEN, in individual and official capacities as superintendent of Lake Washington School District; LISA GUTHRIE, in individual and official capacities as the president of Lake Washington School District Board of Directors; LINDSEY YOCUM, in individual and official capacities as the vice president of Lake Washington School District Board of Directors; ASPEN RICHTER, in individual and official capacities as the legislative representative of Lake Washington School District Board of Directors; ERIC LALIBERTE, in individual and official capacities as a director of Lake Washington School District Board of Directors; ANGELA MEEKHOF, in individual and official capacities as a director of Lake Washington School District Board of Directors,<br><br>*Defendants*. | No. 2:26-cv-03201<br><br>**VERIFIED COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

## INTRODUCTION

1. For over a century, the Supreme Court has held that "parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli v. Bonta*, 607 U.S. 492, 497 (2026) (per curiam) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925)). This "extends to the choices that parents wish to make for their children outside the home," including at their public school. *Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025). Their rights are not "shed at the schoolhouse gate." *Id.* at 546 (citation modified).

2. So when a public school has an "educational requirement or curricular feature" that substantially interferes with the religious development of a child, it cannot deny a parent's request for notice and to opt out. *Id.* at 550.

3. Yet that is what the Lake Washington School District did to Konstantin Averkiev in violation of his constitutional rights. It disregarded his past opt-out request, putting his son, S.A., through a Pride Month lesson in direct violation of *Mahmoud*. The District then doubled down and rejected his new request to excuse his son from LGBTQ+ curricula—plus all other LGBTQ+-related requirements that he told the District violate his religious beliefs and the religious upbringing he desires for his son. That included gender transitions at school.

4. Mr. Averkiev is a Christian who has sincerely held religious beliefs about sex, gender, and marriage that he seeks to instill in his son.

5. As part of his Christian faith, Mr. Averkiev objects to the District instructing his son contrary to these beliefs. He also objects to the District requiring his son to affirm or act in contradiction to his religious development. This includes, for example, forcing his son to affirm gender ideology in class instruction, share intimate spaces (e.g., locker rooms, restrooms, and overnight accommodations) with students of the opposite sex, use biologically inaccurate pronouns, or take part in one-on-one counseling sessions with staff about sexuality or gender.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

6. Yet the District says it will require his son to participate in the District's LGBTQ+ curricula and requirements anyway—even after Mr. Averkiev informed the District of his religious objections and opt-out requests.

7. The problem started last year. When S.A. began fourth grade at Henry David Thoreau Elementary School, Mr. Averkiev met with his teacher and asked that his son be excused from all LGBTQ+ instruction. His teacher agreed. But then he failed to notify Mr. Averkiev of when those lessons were taught or to remove his son from those lessons during the school year.

8. Mr. Averkiev became aware of this in June 2026 when his son came home and described a lesson on gender-change surgery—a lesson Mr. Averkiev had no idea his son would be taught. That violates *Mahmoud*.

9. Mr. Averkiev addressed his concerns with S.A.'s fourth-grade teacher. But he left that conversation worried that his request may be ignored again.

10. Mr. Averkiev then contacted his son's principal by email with similar requests. But she never responded.

11. So during the summer, with S.A. starting fifth grade in the fall of 2026, Mr. Averkiev contacted the District through counsel and provided a written request to opt S.A. out of LGBTQ+-related instruction and requirements, including counseling sessions and the compelled use of biologically inaccurate pronouns. *See* Ex. 1, Letter to Principal Gilmore & Superintendent Holmen (July 27, 2026). He explained that his request was based on his religious beliefs.

12. The District responded by letter and rejected almost all of Mr. Averkiev's opt-out requests. The District indicated it would keep S.A. in LGBTQ+-related instruction, assemblies, and other similar activities, and would not exempt him from compelled pronoun use, shared intimate spaces, or one-on-one counseling sessions about sex, gender, and marriage. The only opt out it granted was for sex-ed curriculum and surveys, Ex. 2, District Response Letter (August 5, 2026)—an opt


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

out explicitly required by Washington state law. Wash. Rev. Code Ann. § 28A.605.005(2)(h)(i-viii), (i); Wash. Rev. Code Ann. § 28A.300.475(7)(a).

13. But Mr. Averkiev's constitutional rights are not so limited. They are clearly established under the First and Fourteenth Amendments. *Mahmoud,* 606 U.S. at 550; *Mirabelli*, 607 U.S. at 495–97. And they extend to every lesson or government-school requirement on his son that would "undermin[e] the religious beliefs and practices" Mr. Averkiev wishes to instill in his son. *Mahmoud,* 606 U.S. at 565 (citation omitted).

14. Mr. Averkiev's free-exercise and parental rights include the right to direct his child's religious upbringing on sensitive topics like sex, gender, and marriage. *See id.* He has informed the school of his religious beliefs and requested notice and opt outs. The District's refusal to grant his requests is unconstitutional.

15. So Mr. Averkiev seeks a preliminary and permanent injunction opting his son out of LGBTQ+ lessons and requirements at school. This would include protecting his son from compelled pronoun use, preventing the District from assigning his son to share intimate spaces with the opposite sex, and prohibiting District staff from instructing or initiating one-on-one discussions with his son on LGBTQ+ topics.

16. Mr. Averkiev also seeks nominal and compensatory damages for Defendants' violations of his First and Fourteenth Amendment rights under the District's no-opt-out policy.

## JURISDICTION AND VENUE

17. This civil-rights action raises federal questions under the First and Fourteenth Amendments to the U.S. Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

18. This Court has original subject-matter jurisdiction over this action. 28 U.S.C. §§ 1331, 1343.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

19. This Court has jurisdiction to issue the requested declaratory relief. 28 U.S.C. §§ 2201–02; *see* Fed. R. Civ. P. 57.

20. This Court has jurisdiction to award the requested injunctive relief. 28 U.S.C. § 1343; *see* Fed. R. Civ. P. 65.

21. This Court has jurisdiction to award nominal and compensatory damages, including presumed damages. 28 U.S.C. § 1343.

22. This Court has jurisdiction to award reasonable attorneys' fees and costs. 42 U.S.C. § 1988; *see* Fed. R. Civ. P. 54.

23. Venue lies in the Seattle Division of the Federal District Court for the Western District of Washington because the parties reside in this Division, 28 U.S.C. § 1391(b)(1), (c)(2), and the events giving rise to the claims here occurred within this Division, *id.* § 1391(b)(2). *See* 28 U.S.C. § 128(b).

**PARTIES**

24. Plaintiff Konstantin Averkiev is a resident of King County, Washington.

25. He is the parent of S.A., a minor child enrolled in Lake Washington School District. S.A. resides with his father.

26. Mr. Averkiev is a Belarusian national and a lawful permanent resident entitled to sue under 42 U.S.C. § 1983. *See Graham v. Richardson*, 403 U.S. 365, 371 (1971); *Yoshikawa v. Seguirant*, 74 F.4th 1042, 1044–45 (9th Cir. 2023).

27. Defendant Lake Washington School District is a school district organized as a corporate entity under Washington law. Wash. Rev. Code Ann. § 28A.315.035.

28. The District is a public corporation that may sue and be sued. Wash. Rev. Code Ann. § 28A.320.010.

29. The District is liable for "any debts legally due, and for judgments against the District." Wash. Rev. Code Ann. § 28A.320.020.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

30. The District operates schools in King County, Washington, including Henry David Thoreau Elementary School, where S.A. attends.

31. Defendant Superintendent Dr. Jon Holmen, sued in individual and official capacities, executes the policies created by the Board of Directors. He is also authorized to establish additional policies to achieve the Board's objectives.

32. The Lake Washington School District Board of Directors, comprised of five directors, sets District policy and holds the superintendent accountable.

33. Defendant Lisa Guthrie, sued in individual and official capacities as the president of Lake Washington School District Board of Directors, was first elected to the Board in November 2023.

34. Defendant Lindsey Yocum, sued in individual and official capacities as the vice president of Lake Washington School District Board of Directors, was first elected to the Board in November 2023.

35. Defendant Aspen Richter, sued in individual and official capacities as the legislative representative of Lake Washington School District Board of Directors, was first elected to the Board in November 2025.

36. Defendant Eric Laliberte, sued in individual and official capacities as a director of Lake Washington School District Board of Directors, was first elected to the Board in November 2015.

37. Defendant Angela Meekhof, sued in individual and official capacities as a director of Lake Washington School District Board of Directors, was first elected to the Board in November 2025.

38. The superintendent and directors have disregarded Mr. Averkiev's clearly established free-exercise rights as most recently affirmed in *Mahmoud* and *Mirabelli*.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

39. *Mahmoud* clearly establishes Mr. Averkiev's free-exercise right to notice and opt outs from LGBTQ+ instruction and requirements that threaten to undermine his son's religious development.

40. And *Mirabelli* reinforces his clearly established right to direct his son's upbringing and education, including his right not to be "shut out" of any consequential decisions about his child's education and wellbeing—specifically at-school gender transitioning. 607 U.S. at 497.

41. The District's no-opt-out policy, custom, practice, and usage—maintained by the Board directors and executed by Superintendent Holmen—violate Mr. Averkiev's clearly established First and Fourteenth Amendment rights.

42. All Defendants are liable under 42 U.S.C. § 1983 for violating Mr. Averkiev's constitutional rights.

## FACTS

### I. Mr. Averkiev holds religious beliefs about sex, gender, and marriage.

43. Konstantin Averkiev is a Christian whose sincerely held religious beliefs guide what he teaches his son about sex, gender, and marriage.

44. Mr. Averkiev's religious beliefs are based on the Bible.

45. He believes God created human beings as male and female, that biological sex reflects divine creation, and that sex and gender are inseparable. He believes children should accept their God-given sex and live accordingly.

46. He believes that marriage is a sacred covenant between one man and one woman, instituted by God, and that sexual intimacy is reserved for marriage.

47. He also believes he has a religious obligation to teach these principles to his son and shield him from conflicting influences. Failing to do so renders him accountable before God.

48. These beliefs are not limited to instruction. Anything that requires his son to affirm contrary beliefs by word or act infringes Mr. Averkiev's parental


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

rights. This includes requiring his son to use biologically inaccurate pronouns, as well as requiring him to share intimate spaces with the opposite sex (e.g., locker rooms, restrooms, and overnight accommodations).

49. Curricula that encourages children to question their gender identity undermines his son's religious development.

50. Mr. Averkiev also believes that letting teachers discuss sexuality with his now 10-year-old son or promote gender transitioning to him is spiritually and emotionally harmful to him.

51. To avoid this conflict, Mr. Averkiev seeks only notice and the opportunity to opt his son out of educational requirements or curricular features that contravene his religious beliefs about sex, gender, and marriage. Yet, to date, the District has refused.

## II. ***Mahmoud*** **and** ***Mirabelli*** **affirm Mr. Averkiev's clearly established rights to direct his son's upbringing and education—specifically as to LGBTQ+ instruction and at-school gender transitioning.**

52. In June 2025, the United States Supreme Court decided *Mahmoud v. Taylor*, 606 U.S. 522 (2025).

53. *Mahmoud* held that the introduction of LGBTQ+-inclusive storybooks, along with the Montgomery County Board of Education's decision to withhold notice and opt outs, placed an unconstitutional burden on parents' right to the free exercise of religion. *Id.* at 569.

54. Less than a year after *Mahmoud*, the Supreme Court decided *Mirabelli v. Bonta*, 607 U.S. 492 (2026).

55. *Mirabelli* held that policies requiring the "unconsented facilitation of a child's gender transition" at school likely violated parents' free-exercise and due-process rights. *Id.* at 496–97. That's because "those policies cut out the primary protectors of children's best interests: their parents." *Id.*



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

56. Despite *Mahmoud*, the District has disregarded Mr. Averkiev's requests for notice and opt outs from LGBTQ+ instruction.

57. Despite *Mirabelli*, the District has disregarded Mr. Averkiev's requests for notice and opt outs from unconsented gender transitioning.

58. Despite *Mahmoud, Mirabelli*, and a century of precedent preceding those cases, the District has disregarded Mr. Averkiev's requests to opt out his son from requirements that undermine his son's religious upbringing.

**III. The District subjects Mr. Averkiev's son to an LGBTQ+ lesson after Mr. Averkiev requested he be opted out of such lessons.**

59. In September 2025—just three months after the Supreme Court decided *Mahmoud*—Mr. Averkiev met in person with his son's fourth-grade teacher, Mr. Warren Petchalonis, at Henry David Thoreau Elementary School.

60. In the meeting, Mr. Averkiev asked for notice and an opt out before any lessons on LGBTQ+ topics, gender identity, or transgender/gender-change subjects so that he could "decide about [his] child's participation." Ex. 3, ParentSquare Messages with Mr. Petchalonis (June 16, 2026). Mr. Averkiev explained that this request was based on his Christian beliefs.

61. Mr. Petchalonis assured Mr. Averkiev that he would notify him and allow him to opt out before any such instruction was given to his son.

62. But Mr. Petchalonis did not honor his assurances. He never notified Mr. Averkiev of LGBTQ+ curriculum or sought his consent during the 2025-2026 school year.

63. In June 2026, Mr. Averkiev learned from his son that his son's class had received a lesson on "gender change" surgery as part of a Pride Month lesson—without prior notice to Mr. Averkiev or his consent. *Id.*


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

64. Mr. Averkiev messaged Mr. Petchalonis on ParentSquare, asking him if he remembered their September conversation regarding notice and opt out. Mr. Averkiev also requested information about the lesson's content. *Id.*

65. Mr. Petchalonis confirmed the lesson and acknowledged that he remembered Mr. Averkiev's opt-out request. He agreed to send the PowerPoint and admitted he should have sent the lessons ahead of time. He also said he "explained" to S.A.'s "5th grade teachers" that they would need to send such material "ahead of time" when it comes up "next year." *Id.* But he said nothing about an opt out.

66. Mr. Petchalonis emailed the slides to Mr. Averkiev. Titled "Pride Month," the slides mapped out a lesson for fourth and fifth graders about the "dislike or prejudice against gay people." Ex. 4, Pride Month PowerPoint. The lesson also instructed fourth graders about the "romantic attraction to people of the same sex or gender," as well as those "whose gender identity does not match the sex they were assigned at birth." *Id.* The lesson also celebrated the "Stonewall Uprising" that launched the "LGBTQ+ fight for freedom and equality." *Id.*

67. The lesson then ran the kids through surveys about LGBTQ+ "belonging" at Henry David Thoreau Elementary School. *Id.* And the lesson emphasized the results of a 2010 Gay, Lesbian & Straight Education Network (GLSEN) survey of elementary students, careful to note that LGBTQ+ bullying is common while bullying a classmate due to their religion is the least common bullying form.

68. So while the in-class instruction concerned gender-change surgery, Mr. Averkiev would not have known that gender-change surgery would be taught even if he had received the slides before the lesson.

69. The next day, Mr. Averkiev wrote Principal Heidi Gilmore. Ex. 5, Email to Principal Gilmore (June 17, 2026). He recounted his September


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

conversation with Mr. Petchalonis about his religious beliefs, request for notice and opt out, and the Pride Month lesson his son was taught without any notice.

70. Mr. Averkiev then made four requests to Principal Gilmore: (1) preserve all materials and communications related to the Pride Month lesson, (2) send him copies of those materials, (3) confirm the content, date, and faculty participation in the lesson—as well as why Mr. Averkiev's opt-out request was not honored, and (4) confirm in writing that he would receive "advance notice and a religious opt-out" for such topics "[b]efore the next school year begins." *Id.* But Principal Gilmore never responded.

### IV. Mr. Averkiev sends written notice-and-opt-out requests under *Mahmoud* and *Mirabelli*—and the District denies them wholesale for anything LGBTQ+-related.

71. Mr. Averkiev then sent a letter through counsel to Principal Gilmore and Superintendent Holmen on July 27, 2026. Ex. 1.

72. Mr. Averkiev's letter recounted the Pride Month lesson incident; referenced *Mahmoud*, *Mirabelli*, and his sincere religious beliefs; and asked for notice and opt outs from all LGBTQ+ lessons, materials, events, and requirements.

73. Given his son's experience in fourth grade, and in an effort to be specific, Mr. Averkiev explained that his request includes: (1) LGBTQ+ curricula, including both core curricula in any subject and any secondary or supplemental lessons, materials, or educational activities taught or otherwise provided to students by any teacher in any subject; (2) LGBTQ+ lessons, materials, or educational activities in any assemblies, school events, or presentations whether presented by students, by District staff, or by outside groups; and (3) LGBTQ+ lessons, materials, or educational activities in any extracurricular activities, clubs, or student groups. *Id.*



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

74. Should any of these arise, Mr. Averkiev requested (1) advance notice of the date, time, location, staff involved, and mandatory status; (2) complete copies of all materials, prompts, surveys, scripts, slides, books, handouts, and links; and (3) the non-stigmatizing alternative assignment or placement that the District would provide his son. *Id.* Mr. Averkiev emphasized that notice and opt outs from LGBTQ+ instruction are required by *Mahmoud*.

75. Mr. Averkiev's letter also withheld permission for the District or any staff member to (1) speak with his son about LGBTQ+ topics in conversation or counseling, (2) change his son's name or pronouns at school or otherwise socially transition his son, (3) require his son to use another student's, teacher's, or staff member's biologically inaccurate pronouns, or (4) require his son to share intimate spaces—including restrooms, locker rooms, or overnight accommodations—with students of the opposite sex. *Id.*

76. Such actions would force his son to affirm or act contrary to the religious upbringing Mr. Averkiev desires for his son.

77. Mr. Averkiev also submitted a notice-and-opt-out request for sex-education instruction. *Id.*

78. The District responded through counsel on August 5, denying all requests except for those mandated by state law. Ex. 2.

79. The District granted Mr. Averkiev's sex-education and survey opt-out requests because Washington law mandates them. *Id.* (citing Wash. Rev. Code Ann. § 28A.605.005(2)(h)(i-viii), (i); Wash. Rev. Code Ann. § 28A.300.475(7)(a)). The District agreed to provide advance notice and alternative activities during sex-education or health classes as required by state statute.

80. But under the District's policy, "any parental opt-out right is specifically limited to sex education and health instruction." *Id.*

81. So the District, applying its no-opt-out policy, rejected all his notice and opt-out requests related to LGBTQ+ instruction or requirements.

82. The District claimed that Mr. Averkiev's requests were "not feasible," "practically impossible," and even "prohibited by state law." *Id.*

83. The District's letter ignored *Mahmoud* and *Mirabelli*—not once mentioning either case—and simply asserted that "there is no provision in the Revised Code of Washington permitting a broad parental opt-out from LGBTQ+ topics that may arise in the ordinary course of education or instruction." *Id.*

84. So under the District's policy, Mr. Averkiev has no right to opt his son out of LGBTQ+ instruction—defying *Mahmoud*.

85. Under District policy, S.A. must comply with LGBTQ+ requirements that contravene Mr. Averkiev's religious beliefs.

86. The District also refused to provide Mr. Averkiev his requested notice, instead offering merely to provide "curriculum information as required by District policy and state law." *Id.* But the curriculum does not reflect all that teachers and other staff members discuss in class, address in an assembly, or say in a counseling session. The District thus refused to provide notice and promised only passive curriculum access.

87. The District also claimed it would be "impractical" for staff to avoid individual conversations about LGBTQ+ topics with S.A.—including in "counseling sessions." *Id.* So the District has placed no limits on staff discussions with S.A. This is especially concerning given the District's refusal to disavow unconsented gender-transition efforts—precisely the conduct *Mirabelli* held "cut[s] out the primary protectors of children's best interests: their parents." 607 U.S. at 496–97.

88. The District also threatened to punish S.A. for "discriminatory harassment" if he "misgender[s]" another student. Ex. 2. But it would violate Mr.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Averkiev's religious beliefs for the District to compel his son to use "preferred" pronouns inconsistent with a person's biological sex.

89. The District denied Mr. Averkiev's request to opt out his son from shared intimate spaces with a student of the opposite sex—including overnight accommodations. The only caveat was restrooms, but even then the District promised only to "discuss" an alternative. *Id.*

## V. District policy weaves LGBTQ+ instruction and requirements into all areas of student life.

90. The District's LGBTQ+ requirements and curricula, combined with its no-opt-out policy, puts Mr. Averkiev in an unconstitutional bind: Forfeit his clearly established constitutional rights or withdraw his son from public school.

91. By design, the District's no-opt-out policy implicates nearly every aspect of student life. The District's Gender-Inclusive Schools policy—adopted in January 2020—applies to "communication and the use of names and pronouns," "restroom and locker room use and accessibility," and "other school activities." Ex. 6, Gender-Inclusive Schools for Students, 3211. That means students must address other "students by their requested name and pronouns, with or without a legal name change." Ex. 7, Student Rights & Responsibilities (2025-2026) at 16.

92. The District also requires students to use or participate in restrooms, locker rooms, sports, physical education courses, field trips, and overnight trips in a way that aligns with students' gender identity. *Id.*

93. Following the District's equity policy, *see* Ex. 8, Procedure - Equity, 0100P, Henry David Thoreau Elementary School has an Equity Team with a Rainbow Squad, led by District employees, that "celebrates" LGBTQ+ "differences" and "support[s]" the school's "LGBTQ+ students." Ex. 9, Equity Team.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

94. Upon information and belief, the Equity Team created the Pride Month PowerPoint that S.A. was taught. *See id.* (noting the Equity Team "created PowerPoint resources with daily resources for classroom use about ... Pride Month").

95. The District "will not condone the intentional or persistent refusal to respect a student's gender identity or gender expression," even when that student's parents are "not supportive" of the preferred names and biologically inaccurate pronouns. Ex. 10, Procedure Gender-Inclusive Schools for Students, 3211P.

96. District policy requires "inclusive curricula" that "include[s] the histories, contributions, and perspectives of ... LGBTQ people." Ex. 11, Procedure Course Design Selection and Adoption of Instructional Materials, 2020P.

97. A peek at the District's approved instructional materials list shows "inclusive curricula" in action. Ex. 12, Approved Instruction & Materials List. For example, *Maizy Chen's Last Chance* includes themes Mr. Averkiev would opt his son out of, such as the main character's conception via a donor and the principal's same-sex marriage. *See* Ex. 13, Book Review of *Maizy Chen's Last Chance*.

98. The District also promotes lessons from the Southern Poverty Law Center's "Learning for Justice," a program that "celebrate[s]" LGBTQ+ identities and teaches LGBTQ+ history. Ex. 14, Learning for Justice. For instance, the program resources include a story called *Fireflies*, which is about a 10-year-old who comes out to his brother and finds "love and acceptance." Ex. 15, *Fireflies*.

99. Another book, *Posted*, tells the story of a middle schooler questioning his sexuality. Ex. 16, Book Review of *Posted*.

100. These materials are just the tip of the iceberg. The curriculum list omits the Pride Month lesson S.A. sat through. So the curriculum list would not have informed him of that lesson. Plus, even if the list included the Pride Month slides, Mr. Averkiev would not have discovered the gender-change surgery content.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

101. These materials present contested views on sex and gender that directly conflict with the religious beliefs Mr. Averkiev wishes to instill in his son. The District's withheld notice and opt outs from such instruction independently violates *Mahmoud*.

102. Mr. Averkiev doesn't know what else the District may teach his son, when his son will be pressured to affirm LGBTQ+ beliefs or participate in LGBTQ+-affirming events, or when the District will engage in gender-transition efforts. That's by design and how the District's policy works.

103. But Mr. Averkiev does know that such instruction and actions will violate his religious beliefs and undermine his son's religious development.

104. The District knows or should know when it schedules LGBTQ+-affirming instruction, or discusses LGBTQ+ topics, or imposes LGBTQ+ requirements on S.A., yet it refuses to provide Mr. Averkiev notice or opt outs.

105. The District withholds opt outs from Mr. Averkiev despite excusing absences for numerous reasons, including "religious or cultural purposes" and "observance of a religious holiday." Ex. 17, Procedure Excused and Unexcused Absences, 3122P. And like other school districts nationwide, the District routinely provides individualized programming for students with Individualized Education Programs (IEPs) and multilingual learners—removing them from standard instruction for specialized services. *See* Lake Washington School District, Multilingual Learners, perma.cc/V8BM-UY65; Lake Washington School District, Special Services, perma.cc/6ARR-3TLW.

## VI. The District's no-opt-out policy inflicts ongoing constitutional burdens on Mr. Averkiev.

106. The District should have known about *Mahmoud* and *Mirabelli* before S.A. sat through a Pride Month lesson without notice to Mr. Averkiev. There's no question the District knew about those precedents when it denied Mr. Averkiev's


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

LGBTQ+ opt-out requests in the summer of 2026—Mr. Averkiev informed the District of both in his letter.

107. The Court decided *Mahmoud* on June 27, 2025, and issued its per curiam opinion in *Mirabelli* on March 2, 2026.

108. Both decisions clearly establish that parents have a fundamental right to direct their children's religious upbringing and that schools cannot withhold notice and opt-out rights from instruction and requirements that burden that right. *Mahmoud* involved instruction, and *Mirabelli* involved at school gender transitions—two of the exact requests Mr. Averkiev made to the District.

109. Despite the Supreme Court's clear holding that withholding notice and opt-outs from LGBTQ+ instruction and requirements unconstitutionally burdens parents' constitutional rights, the District denied Mr. Averkiev's opt-out requests on August 5, 2026—after failing to honor his first opt-out request when S.A. sat through the Pride Month lesson.

110. By structuring its policies to deny parental notice and opt outs, the District unconstitutionally conditions the receipt of the benefit of public school on Mr. Averkiev's willingness to accept a burden on the exercise of his constitutional rights.

111. Given the District's dismissive response to Mr. Averkiev's requests, the constitutional violations alleged herein will continue absent injunctive relief.

## COUNT I

### Free Exercise of Religion
### (U.S. Const. amends. I, XIV; 42 U.S.C. § 1983)

112. The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see id.* amend. XIV.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

113. Mr. Averkiev's free-exercise rights include the right to raise and educate his son consistent with his religious beliefs on sex, gender, and marriage.

114. His free-exercise right also includes "the right not to be shut out" of consequential decisions regarding his son's wellbeing. *Mirabelli*, 607 U.S. at 496–97.

115. The District's LGBTQ+-affirming instruction and requirements without parental notice or opt-out rights violates Mr. Averkiev's free-exercise rights by substantially interfering with the religious development of his son. *Mahmoud*, 606 U.S. at 565.

116. District policies require students to engage in LGBTQ+ instruction and events, use other students' or District staff's biologically inaccurate pronouns, and share intimate spaces with students based on gender identity. District policies otherwise exclude parents from LGBTQ+ conversations between District staff and students, including in counseling sessions.

117. The District withholds opt outs from any of these requirements. The District's no-opt-out policy violates Mr. Averkiev's free-exercise rights in at least four ways.

118. First, it subjects his son to LGBTQ+ instruction and LGBTQ+-affirming events without parental notice or opt outs—undermining the religious beliefs and practices he wishes to instill in his son. That's exactly what happened in *Mahmoud*.

119. Second, it shuts Mr. Averkiev out of discussions, counseling sessions, and consequential decisions that affect his child's wellbeing and religious development. That's exactly what happened in *Mirabelli*.

120. Third, it coerces his son to adopt and mouth the government's viewpoint on gender identity and biologically inaccurate pronouns.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

121. Fourth, it forces his son to share intimate spaces—including locker rooms, restrooms, and overnight accommodations—with opposite-sex students or forgo public benefits like overnight school trips completely.

122. Public school is a public benefit, as are the activities that students engage in at public school.

123. The District's no-opt-out policy forces Mr. Averkiev to choose between public school enrollment—and many of the benefits that come with it—and exercising his right to direct his son's religious development. *See Mahmoud*, 606 U.S. at 562–63; Wash. Rev. Code Ann. § 28A.225.010.

124. These are "unacceptable" burdens on Mr. Averkiev's religious exercise—each of which triggers strict scrutiny. *Mahmoud*, 606 U.S. at 550.

125. The District's no-opt-out policy also receives strict scrutiny because it is neither neutral nor generally applicable.

126. The District's no-opt-out policy is not generally applicable because, among other things, the District allows opt outs for sex education and surveys. *See id.* at 566.

127. The District's no-opt-out policy also conditions Mr. Averkiev's access to public benefits on his willingness to forfeit his free-exercise rights. This, too, demands strict scrutiny. *Carson v. Makin*, 596 U.S. 767, 780 (2022).

128. The no-opt-out policy's burdens on Mr. Averkiev's religious exercise fail strict scrutiny because they are not narrowly tailored to any legitimate or compelling interest. The question "is not whether the [District] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to" Mr. Averkiev. *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021). It doesn't.

129. Defendants acted under District policy, practice, custom, and usage.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

130. Mr. Petchalonis followed District policy when he failed to honor the opt-out request.

131. The District's policy has denied Mr. Averkiev his constitutional rights and, absent an injunction, will continue to irreparably harm him.

132. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

133. Mr. Averkiev is thus entitled to an injunction prohibiting Defendants from allowing District staff to instruct S.A. on any LGBTQ+ topics or include S.A. in any LGBTQ+-affirming events.

134. Mr. Averkiev is entitled to an injunction prohibiting Defendants from discussing LGBTQ+ topics with S.A., including in counseling sessions.

135. Mr. Averkiev is entitled to an injunction prohibiting Defendants from forcing S.A. to use biologically inaccurate pronouns toward another student or District staff.

136. Mr. Averkiev is entitled to an injunction prohibiting Defendants from forcing S.A. to share intimate spaces with the opposite sex or otherwise exclude him for failing to comply. So far, the District has promised only to "discuss" an alternative. Ex. 2. For restrooms, Mr. Averkiev requests only that District staff allow his son to stay outside the restroom while an opposite-sex student occupies the restroom. That means the District cannot compel S.A. to use the restroom at the same time as an opposite-sex student. And the District has not explained why it is unable to provide a similar alternative for locker rooms, much less assign S.A. to same-sex overnight rooming assignments.

137. To ensure this relief, the District must provide prior notice of all such instruction, events, or demands.

138. Mr. Averkiev is entitled to nominal and compensatory damages for the loss of his free-exercise rights, including his right to direct his son's religious


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

upbringing. He will continue to be harmed as long as Defendants persist in their no-opt-out policy.

139. Under this count, Mr. Averkiev seeks nominal and compensatory damages—including presumed damages and the costs associated with the failed opt-out requests—from the District.

140. Mr. Averkiev also seeks damages from Superintendent Holmen and the Board directors in their official and individual capacities. *Mahmoud* and *Mirabelli* were clear and binding, but Defendants have defied them.

**COUNT II**

**Fundamental Right to Direct Child's Upbringing and Education (U.S. Const. amend. XIV; 42 U.S.C. § 1983)**

141. The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

142. This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

143. Among the fundamental rights and liberty interests the Constitution protects is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

144. This fundamental right "without doubt" includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

145. The fundamental right of parents to direct the upbringing and education of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted).

146. "The right protected by these precedents includes the right not to be shut out of participation in decisions regarding their children's mental health." *Mirabelli*, 607 U.S. at 497. So public schools may not "facilitate a degree of gender transitioning during school hours." *Id.*

147. Mr. Averkiev's right to direct his child's upbringing is doubly protected when it implicates his child's religious upbringing—protected by both the First and Fourteenth Amendments.

148. Forcing LGBTQ+-affirming content and requirements on S.A. after Mr. Averkiev asserted his religious objection—without notice or opt-out rights—is inconsistent with that precedent and stifles parents' ability to instill their beliefs in their children.

149. When the government conceals information necessary for parents to make consequential decisions about their children's upbringing on matters like sex, gender, and marriage, it violates parents' fundamental rights.

150. By withholding notice and opt outs from LGBTQ+-affirming instruction and requirements, Defendants interfered with and denied Mr. Averkiev's fundamental right to direct the upbringing and education of his son regarding important topics like sex, gender, and marriage.

151. Like Defendants' free-exercise violations, each parental-right violation is distinct as to instruction, gender transitions, speech, and intimate spaces.

152. Strict scrutiny applies to Defendants' violations of Mr. Averkiev's fundamental right to direct the upbringing and education of his son.

153. There is no legitimate or compelling state interest in requiring S.A. to participate in LGBTQ+-affirming instruction and requirements, much less an


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

interest that outweighs Mr. Averkiev's constitutional right to direct the education and upbringing of his son.

154. Defendants' actions violating Mr. Averkiev's fundamental rights are neither narrowly tailored to any compelling interest nor rationally related to a legitimate interest.

155. Defendants and Mr. Petchalonis acted under District policy, practice, custom, and usage.

156. Defendants' actions under District policy, practice, custom, and usage are unlawful under the Fourteenth Amendment.

157. By violating Mr. Averkiev's fundamental rights, Defendants have irreparably harmed him and, absent an injunction, will continue to do so.

158. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

159. Mr. Averkiev is entitled to an injunction prohibiting Defendants from allowing District staff to instruct S.A. on any LGBTQ+ topics, include S.A. in any LGBTQ+-affirming events, discuss LGBTQ+ topics with S.A. (including in counseling sessions), force S.A. to use biologically inaccurate pronouns toward another student or District staff, or force S.A. to share intimate spaces with the opposite sex or otherwise excluding him for failing to comply. To ensure this relief, the District must provide prior notice of all such instruction, events, or demands.

160. Mr. Averkiev is entitled to nominal and compensatory damages, including presumed damages and the costs associated with the failed opt-out requests, against the District, Superintendent Holmen, and the Board directors in their individual and official capacities. *Mirabelli* was clear and binding, but Defendants have defied that precedent.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

## COUNT III

### Deprivation of Liberty Without Due Process of Law
### (U.S. Const. amend. XIV; 42 U.S.C. § 1983)

161. The U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

162. In general, procedural-due-process principles protect persons from deficient procedures that deprive them of cognizable liberty interests.

163. To establish a procedural-due-process violation, Mr. Averkiev needs to show "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Hufford v. McEnaney,* 249 F.3d 1142, 1150 (9th Cir. 2001).

164. The liberty interest of parents in "the care, custody, and control of their children … is perhaps the oldest of the fundamental liberty interests." *Troxel*, 530 U.S. at 65 (plurality op.).

165. District policy withholds notice and opt-out rights from Mr. Averkiev on all LGBTQ+ instruction and requirements outside the sex-education curriculum.

166. District policy caused a due-process violation when the District gave Mr. Averkiev no notice or opportunity to opt out before putting his son through a Pride Month lesson that featured a gender-change surgery discussion.

167. District policy will continue to subvert Mr. Averkiev's procedural-due-process rights by refusing to provide notice.

168. The District promises to withhold notice before it teaches Mr. Averkiev's son LGBTQ+-affirming content.

169. The District promises to withhold notice before it engages in counseling sessions about gender dysphoria with S.A., cutting Mr. Averkiev out of a consequential mental-health decision against *Mirabelli*'s command.


ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

170. The District promises to withhold notice before his son shares intimate spaces with the opposite sex.

171. The District promises to withhold notice before it punishes Mr. Averkiev's son for failing to use biologically inaccurate pronouns (or, to use the District's words, for "misgendering" a classmate).

172. Defendants and Mr. Petchalonis performed their actions under the policy, practice, custom, and usage of the District.

173. Mr. Averkiev is entitled to nominal and compensatory damages, including presumed damages and the costs associated with the failed opt-out requests, from the completed procedural-due-process violation, as well as damages from any continued deprivation of process.

174. Mr. Averkiev sues the District, Superintendent Holmen, and the Board directors in their official capacities for these damages.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Averkiev respectfully requests that this Court:

A) Enter judgment against Defendants;

B) Issue a declaration that the District's no-opt-out policy, as applied to Mr. Averkiev, violates his First and Fourteenth Amendment rights under the United States Constitution;

C) Issue a preliminary and permanent injunction that prohibits Defendants from enforcing the District's no-opt-out policy against Mr. Averkiev, ensuring that Defendants (1) notify Mr. Averkiev in advance of any LGBTQ+ instruction or events and grant Mr. Averkiev's opt-out requests for S.A. without penalty; (2) notify Mr. Averkiev in advance when any District staff will engage in LGBTQ+-related discussions with S.A. and opt S.A. out of those discussions without penalty; (3) notify Mr. Averkiev in advance of any biologically inaccurate pronoun requirement and opt S.A. out of that requirement without penalty; (4) notify Mr.



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020

Averkiev in advance before his son would be required to share intimate spaces with the opposite sex and opt S.A. out of that requirement without penalty.

D) Award the nominal and compensatory damages to which Mr. Averkiev is entitled, including presumed damages and such other damages to which he may be entitled against the Defendants;

E) Award Mr. Averkiev's reasonable attorney fees, court costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988;

F) Award such other and further relief as the Court deems equitable, just, and proper; and

G) Retain jurisdiction of this matter as necessary to enforce the Court's orders.

Respectfully submitted this 8th day of September, 2026,

By: s/ *Katherine L. Anderson*
Katherine L. Anderson
WSBA #41707
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0025
kanderson@ADFlegal.org

By: s/ *David A. Cortman*
David A. Cortman*
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
Facsimile: (770) 339-6744
dcortman@ADFlegal.org

By: s/ *Noel W. Sterett*
Noel W. Sterett*
IL Bar No. 6292008
By: s/ *Dalton A. Nichols*
Dalton A. Nichols*
IN Bar No. 37499-71
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
nsterett@ADFlegal.org
dnichols@ADFlegal.org

*Attorneys for Plaintiff Konstantin Averkiev*

* Applications for leave to appear *pro hac vice* submitted concurrently with this complaint.

# DECLARATION UNDER PENALTY OF PERJURY

I, Konstantin Averkiev, have read the foregoing complaint. I declare under penalty of perjury under 28 U.S.C. § 1746 that the factual allegations pertaining to my personal experiences are true and correct to the best of my knowledge.

Executed on September 4, 2026, at Kirkland Washington.

________________________
Konstantin Averkiev



ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020